*In re* ESTATE OF LAWRENCE BYRD, a Disabled Person (Allen Jackson, Sr., Plenary Guardian of the Estate and Person of Lawrence Byrd, Plaintiff-Appellant, v. Elliott Muse *et al.*, Defendants-Appellees).

First District (6th Division)   No. 1—90—0645

Opinion filed March 20, 1992.—Rehearing denied April 22, 1992.

Berton N. Ring, of Berton N. Ring & Associates, of Chicago, for appellant.

Carol A. Johnson & Associates, of Chicago, for appellee Carol Johnson.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

Allen Jackson (Jackson) is the first cousin of Lawrence Byrd (Byrd); Gladys Jackson is his wife; they were tenants in Byrd's building. Norma Brandon (Brandon) is the daughter of Lawrence Byrd. Allen Jackson and Norma Brandon separately petitioned to be named the guardian of the estate and person of Lawrence Byrd. After a trial, the judge granted Jackson's petition and denied Brandon's petition, but granted the petitions of Brandon's attorneys for fees. Jackson appeals from the order granting fees. Brandon does not appeal from the orders granting Jackson's petition and denying her petition.

On February 2, 1989, Mozelle Byrd, the mother of Lawrence Byrd, died. Ill will developed between the Jacksons and Brandon; they had been friendly before. Around the middle of February, Gladys Jackson drove Byrd to First National Bank of Chicago, where Byrd placed Gladys' name on his bank accounts.

On April 16, Byrd signed a quitclaim deed to his property at 7828 South Prairie in Chicago naming Brandon as grantee. Brandon, who was born out of wedlock, explained that her father felt remorseful about not having done more for her while she was growing up. She also explained that she and her father thought that he was merely placing her name on the property when he signed the deed.

On May 8, Gladys Jackson went to the First National Bank and removed approximately $150,000 from one of Byrd's accounts on which she had had her name placed; she closed Byrd's account and placed the money in an account which she held jointly with her husband. Allen Jackson testified that he did not know that she had not placed Byrd's name on the joint account. Gladys Jackson testified that she understood the money to be hers to do with as she pleased.

On May 9, Byrd, accompanied by Brandon, went to the First National Bank of Chicago and discovered that Gladys Jackson had closed his account of approximately $150,000. While at the bank, Norma Brandon removed Gladys Jackson's name from Byrd's remaining accounts and placed her own name on the accounts. The following day

Allen and Gladys Jackson took Byrd to see Dr. Vergara, who later provided the court with a report which alleged that Byrd was mentally incompetent. On May 12, Byrd, accompanied by Brandon, retained attorney Elliott Muse to file a petition in the chancery division of the circuit court naming the Jacksons as defendants seeking the return of the $150,000. On May 13, Brandon and Byrd went to the law office of attorney Vaughn Barber, accompanied by Byrd's cousin, Luther Townsley. Byrd signed a document giving Brandon his power of attorney. On May 16, a judge of the chancery division of the circuit court entered a temporary restraining order against First National Bank of Chicago and the Jacksons to prevent the Jacksons from using or disposing of Byrd's money.

On May 23, Allen Jackson filed a petition in the probate division of the circuit court asking that he be named guardian of Byrd's estate and person; the court appointed Mark Schwartzman to be Byrd's guardian *ad litem*. The following day Schwartzman informed Byrd and Brandon that a hearing was scheduled for May 25 in the probate division of the circuit court. Brandon and Byrd immediately contacted Carol Johnson and retained her to represent Byrd and to oppose the appointment of a guardian or, if guardianship was unavoidable, to represent Brandon in an attempt to have her appointed as guardian of his person and estate. Carol Johnson was paid a retainer fee of $1,000.

Johnson appeared at the hearing on May 25. The judge of the probate division was informed of the pending chancery case which had been filed to prevent the Jacksons from disposing of Byrd's $150,000. The judge entered an agreed order restraining everyone from withdrawing any funds from any of Byrd's accounts at First National Bank and Continental Bank. The judge also restrained Brandon from using the power of attorney or the deed to the property at 7828 South Prairie. The case was continued to June 29, 1989.

After the hearing on May 25, Carol Johnson asked Brandon to take Byrd to a doctor to be examined for mental competency. Dr. Hoyland Ricks examined Byrd and diagnosed him as having a mild case of senility. Johnson then consulted with Dr. Samuel Johnson, who, based on the diagnosis given by Ricks, stated that Byrd would likely become incompetent within the next three to six months.

On June 29, an agreed order was entered adjudicating Byrd disabled. Brandon testified that she had taken a leave of absence from her job so that she could care for her father, as she had done the previous year when her mother became ill. The judge allowed Byrd to continue staying with her. The judge also allowed Brandon to receive,

but to account for, Byrd's personal pension checks totalling $1,809 per month.

On July 31, Jackson filed a petition for a rule to show cause which alleged that Brandon, unknown to her attorneys, had used Byrd's bank accounts in Continental Bank.

On August 7, Brandon testified that she was unaware of any accounts which Byrd had at Continental Bank until a few days following the June 29 court date when Byrd was adjudicated disabled. She said that at that time, Byrd, knowing that Brandon was in need of money and knowing that she owed money to friends from whom she had borrowed during her mother's illness, told her about accounts which he had at Continental Bank and suggested that she use some of that money to pay her bills and to repay her loans. Byrd and his cousin Townsley accompanied her to the bank. She testified that she believed that "disabled" meant that a person was unable to make decisions or give directions when that person was incoherent.

Brandon testified that she used Byrd's car for personal reasons, used his funds to repair the car even though he did not drive, closed an account of Byrd's containing $16,000 and put her name on the account. She also used Byrd's funds to pay $2,250 of her attorney fees, parking tickets, rent, telephone bills, gas bills, electric bills, her daughter's tuition at a private school and a beauty shop bill; she also made church donations with his funds.

On December 19, the judge entered an order naming Allen Jackson guardian of the estate and person of Byrd; he denied the counterpetition of Brandon to be named guardian; he also restrained Brandon from affecting any of Byrd's assets.

On January 22, 1990, Elliott Muse filed a petition for fees, and Carol Johnson filed a petition for fees on January 31, 1990. On February 16, an agreed order was entered in which Brandon agreed to pay $4,500 to the estate to cover her own indebtedness. She did not admit to any wrongdoing, and the judge made no specific finding of wrongdoing. On February 28, the judge entered an order awarding Elliott Muse fees in the amount of $5,937 and Carol Johnson fees in the amount of $10,920. The order also recited that the fees should be paid by Byrd's estate.

It is necessary to set forth the issues as the parties presented them to the trial judge and as they have presented them to us. Both Muse and Johnson filed verified petitions for fees. Muse alleged that he had been retained by Byrd and Brandon on May 12, and had performed services in the actions filed in the chancery and probate divisions. His petition contained an itemized breakdown of the time spent

and the services he had rendered. Johnson's verified petition alleged that she had been retained by Byrd before he was adjudicated disabled and that she was merely carrying out the request of Byrd in attempting to have Norma Brandon appointed guardian. She argued that the fact that she was acting upon the directions given by Byrd before he was adjudicated disabled should be sufficient for the court to grant her petition for fees. She also attached an itemized statement of services rendered and the time spent.

Jackson filed a response to both petitions. Included in the response is the following:

"The estate does not take issue with the quality of the work, the hourly rate, that compensation is due, or the allegation that they were retained by Brandon. Rather, they are not entitled to payment of fees from the estate since neither represents a representative, nor have they conferred *any* benefit upon the estate." (Emphasis in original.)

Jackson's argument is twofold: He maintains that there is no statutory basis for the granting of fees to Muse and Johnson and that the services rendered by Muse and Johnson failed to provide any benefit to the estate. Johnson's argument is also twofold:[1] The Probate Act of 1975 (Ill. Rev. Stat. 1989, ch. 110½, par. 1—1 *et seq.*) does not bar recovery of fees and, even in the absence of any statutory authority, she is entitled to fees based on her own contract of employment with Byrd. Jackson now counters that the contracts between Johnson and Byrd and Muse and Byrd were unenforceable because, he maintains, Byrd entered into the contracts with Muse and Johnson after the appointment of a guardian *ad litem*. That argument was not made in response to the petitions for fees. We do not believe the failure to raise that point in the probate division was inadvertent. Significantly, the Jacksons filed a motion to dismiss the chancery action on September 8, 1989. That motion to dismiss alleged that at the time the chancery action was filed on May 16, 1989, Brandon knew that Byrd was a disabled person as defined by the Probate Act. The motion further alleged that at the time of the commencement of the chancery action Byrd had no capacity to sue in any action and that his lack of capacity was known to Norma Brandon. We repeat that this argument was not made in response to the petition for fees. We conclude, therefore, that Jackson has waived the right to argue that the contracts of employment between Muse and Byrd (not Brandon) and Johnson and Byrd

---

[1]Muse has not filed a brief in this court.

(not Brandon) were unenforceable. Nonetheless, we have decided to address the question.

We emphasize that even in this court Jackson does not maintain that Johnson failed to establish the existence of the contract between her and Byrd. He does not argue that Byrd was mentally incompetent at the time that he entered into the contracts with Muse and Johnson.

■ We will first address the question of the enforceability of the contract. Section 11a—22(b) of the Probate Act (Ill. Rev. Stat. 1989, ch. 110½, par. 11a—22(b)) provides as follows:

> "(b) Every note, bill, bond or other contract by any person for whom a plenary guardian has been appointed or who is adjudged to be unable to so contract is void as against that person and his estate, but a person making a contract with the person so adjudged is bound thereby."

Jackson's argument depends entirely on his contention that a guardian *ad litem* is a "plenary guardian." We cannot accept that contention. The Probate Act itself distinguishes between a plenary guardian and a guardian *ad litem*. Section 11a—3 (Ill. Rev. Stat. 1989, ch. 110½, par. 11a—3(a)) provides as follows:

> "(a) Upon the filing of a petition by a reputable person or by the alleged disabled person himself or on its own motion, the court may adjudge a person to be a disabled person and may appoint (1) a guardian of his person, if because of his disability he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person, or (2) a guardian of his estate, if because of his disability he is unable to manage his estate or financial affairs or (3) a guardian of his person and of his estate."

Section 11a—10(a) provides as follows:

> "(a) Upon the filing of a petition pursuant to Section 11a—8, the court shall set a date and place for hearing to take place within 30 days. The court shall appoint a guardian ad litem to represent the respondent, except that the appointment of a guardian ad litem shall not be required when the court determines that such appointment is not necessary for the protection of the respondent or a reasonably informed decision on the petition." Ill. Rev. Stat. 1989, ch. 110½, par. 11—10(a).

■ In addition to the distinction between the two terms which appears in the statute itself, we refer to the commonly accepted definitions of the terms. A guardian *ad litem* is "a special guardian appointed by the court to prosecute or defend, in behalf of an infant or incompetent, a suit to which he is a party, and such guardian is con-

sidered an officer of the court to represent the interests of the infant or incompetent in the litigation." (Black's Law Dictionary 635 (5th ed. 1979).) A general or plenary guardian is "one who has the general care and control of the person and estate of his ward." Black's Law Dictionary 635 (5th ed. 1979). *Cf. In re Marriage of Koenig* (1991), 211 Ill. App. 3d 1045, 570 N.E.2d 861 (court noted that the legislature had limited a minor child's representative to either his or her general guardian *or* court-appointed guardian *ad litem*).

The facts of this case illustrate that acceptance of Jackson's argument would be unwise. Jackson filed a petition and attached the untested report of Dr. Vergara. The court appointed the guardian *ad litem*. All of these proceedings occurred without notice to Byrd. The practical effect of accepting Jackson's argument would be that any person who was merely alleged to be disabled could be barred from retaining his own attorney to contest the petition seeking appointment of a guardian who could take control of his life and his estate. The possibility for abuse of the procedure followed in this case is manifest.

■ Acceptance of the argument would also be unfair to the lawyers. There is no suggestion that they acted in anything but good faith when they contracted with Byrd. No fair-minded person would fault Muse and Johnson for having a reasonable belief that the Jacksons were out to plunder the estate and that Allen Jackson would not be a fit plenary guardian. Any wrongdoing of Brandon should not be imputed to the lawyers, who, Jackson concedes, were unaware of Brandon's wrongdoing.

For these reasons, we conclude that appointment of a guardian *ad litem* did not render any subsequent contract of employment between Johnson and Byrd unenforceable. We note further that the contract between Muse and Byrd was entered into before the appointment of the guardian *ad litem*.

Although we could affirm the judgments on the ground that Muse and Johnson were entitled to fees based on their employment contracts with Byrd, we deem it appropriate to address the other argument raised by Jackson. He maintains that the statutory authorization for attorney fees does not include Brandon and that Brandon did nothing to benefit the estate of Byrd.

Both sides rely on *In re Estate of Roselli* (1979), 70 Ill. App. 3d 116, 388 N.E.2d 87. In that case Alfredo Roselli died intestate. His nephew, Vincent Roselli, petitioned to be named administrator of the estate. Over his objection, another nephew Luigi Roselli, who had the consent of the majority of the other heirs, was named administrator.

Vincent's attorney filed a claim for attorney fees for services rendered on behalf of Vincent's own claim and in opposition to Luigi's petition. The trial judge awarded fees, and the administrator appealed.

The administrator argued that Vincent was not a "representative" as that term is used in section 27—2 of the Probate Act (Ill. Rev. Stat. 1989, 110½, par. 27—2), which provides that "[t]he attorney for a representative is entitled to reasonable compensation for his services" and section 1—2.15 of the Act (Ill. Rev. Stat. 1989, ch. 110½, par. 1—2.15), which provides that " '[r]epresentative' includes executor, administrator, administrator to collect, guardian and temporary guardian." The administrator also argued that Vincent's actions were not in the interest of the estate. The appellate court, in affirming the judgment, held that it could not be said that the legislature intended to limit the word "representative" only to those persons legally appointed to act; the court said that the word " 'representative' is quite broad, meaning simply one who represents." (*Roselli*, 70 Ill. App. 3d at 123.) The court recognized that attorney fees are normally awarded only to an attorney not hired by an executor or administrator if legal services were in the interest of the estate, citing *In re Estate of Freund* (1978), 63 Ill. App. 3d 1, 379 N.E.2d 935. The court added, however, that fees were justified in the case before it even for an unsuccessful representative "because by bringing the suit he has benefitted the estate." *Roselli*, 70 Ill. App. 3d at 123.

■ In the case before us, the judge made five specific findings of benefit to the estate due to the actions of Muse and Johnson. He first found that Muse and Johnson had "protected estate property which was necessary for Byrd's support and maintenance" by successfully restraining any use of the funds of Byrd which had been transferred from his bank account at First National Bank by Gladys Jackson until an investigation and determination could be made by the court. Jackson deprecates this finding. He asks rhetorically if the order in the chancery court was a benefit to the estate, "[W]hy did the Chancery Court in an October 23, 1989, order dismiss the cause of action brought by the Petitioners, Lawrence Byrd and Norma Brandon[?]" The answer to Jackson's rhetorical question is that the chancery case was dismissed by agreement of the parties *after* the judge of the probate division had also entered an order restraining the parties from using any of Byrd's assets.

The other four findings made by the judge, in effect, held that the estate had been benefited by Johnson and Muse's resistance to Jackson's petition on behalf of Byrd. He said that the actions of Muse and

Johnson permitted him to "more fully evaluate and determine who [he] felt would best serve as guardian." Jackson has taken the same position that the administrator took in *Roselli*. He does not argue that the judge erred in some of his findings; he argues that the judge erred in all of them. Implicitly, Jackson concedes, as did the administrator in *Roselli*, that affirmance of any of the judge's findings of benefit would support the award that was entered. (See *Roselli*, 70 Ill. App. 3d at 124.) Since we have determined that the first finding of the judge is supported by the evidence, we need not consider the other four findings. We conclude, therefore, that Brandon was a proper representative, that her unsuccessful resistance to the petition of Jackson does not bar her recovery of fees and that her actions benefited the estate to some extent.

In order for a reviewing court to reverse a decision made by a trial judge, the trial judge must have abused his discretion to such an extent that his decision was manifestly and palpably erroneous. (*Weiss v. Weiss* (1983), 113 Ill. App. 3d 793, 447 N.E.2d 437; *In re Estate of Minsky* (1978), 59 Ill. App. 3d 974, 376 N.E.2d 647.) On the record before us, we cannot say that the judge abused his discretion in the award of fees.

The judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and RAKOWSKI, JJ., concur.