# Illinois Official Reports

## Appellate Court

---

### *Murillo v. City of Chicago*, 2016 IL App (1st) 143002

---

| | |
|---|---|
| Appellate Court Caption | ARCADIA MURILLO, Plaintiff-Appellee and Cross-Appellant, v. THE CITY OF CHICAGO, Defendant-Appellant and Cross-Appellee. |
| District & No. | First District, Second Division<br>Docket No. 1-14-3002 |
| Filed | August 2, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-36826; the Hon. Patrick F. Lustig, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part, and remanded with directions. |
| Counsel on Appeal | Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Jonathon D. Byrer, Assistant Corporation Counsel, of counsel), for appellant.<br><br>Matthew J. Piers, Joshua Karsh, and Christopher J. Wilmes, all of Hughes Socol Piers Renick & Dym, Ltd., of Chicago, for appellee. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Neville and Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1    This case asks us to interpret a section of the Illinois Human Rights Act (Act) (775 ILCS 5/2-103(A) (West 2014)) that prohibits employers from "[using] the fact of an arrest" as a basis to discriminate in employment.

¶ 2    Plaintiff Arcadia Murillo, after about three years working as a janitor at a Chicago police station, was required to submit to a background check to keep her job. The background check revealed a 1999 arrest for a drug charge, which had been dismissed for lack of probable cause. The City of Chicago (City), however, refused to give Murillo security clearance, and eventually she was fired. The trial court held the City violated the Act by using the fact of Murillo's arrest to alter the terms of her employment.

¶ 3    We affirm; the City did indeed use the fact of Murillo's arrest in violation of the Act. Further, we remand to the trial court (i) to reexamine the reductions of time spent by Murillo's attorneys on the case and give reasons for any reductions, (ii) to adjust the fee calculation in light of the attorneys' hourly rates, and (iii) to determine additional fees (and costs) for defending this appeal and the City's section 2-1401 (735 ILCS 5/2-1401 (West 2014)) petition.

¶ 4                                           BACKGROUND

¶ 5    On February 5, 1999, police officers spotted a man outside The Friendly Tap, a Chicago bar. The man was carrying drugs, and the police arrested him. The police then went inside the bar to inspect the premises and saw a clear plastic bag hanging from the rafters. The bag contained individual bags of cocaine, and the police arrested the bartender, Arcadia Murillo.

¶ 6    The arrest report cited Murillo for possession of a controlled substance and "illegal conduct on premises" (a municipal offense). The report stated that "above arrested in that she was a bartender at the Friendly Tap, a licensed premise in which was found a quantity of a controlled substance, cocaine. The above was in actual control of the premises at the time of the violation." The officers' "case report" contained slightly more detail about the man arrested outside the bar but did not give any details of Murillo's conduct during this incident, simply stating that "the bartender [Murillo] was placed into custody and read rights per [*Miranda*]." The trial judge promptly dismissed the charges against Murillo for lack of probable cause.

¶ 7    In 2006, Murillo got a job with a contractor as a janitor at the first district station of the Chicago police department. Murillo continued this employment without incident until Triad Consulting Services (Triad) took over the contract to clean city facilities. The City asked Triad to submit its employees for background checks so that each employee could be issued a security badge.

¶ 8    The Chicago police fingerprinted Murillo in January 2009, and the check of criminal records revealed her 1999 arrest. Police sergeant Raymond Gawne conducted the background checks and obtained state and FBI records related to a person's fingerprints. This "criminal history report" reflected Murillo's 1999 arrest (for possession of a controlled substance and failing to "cooperate with police re illegal activity in licensed premise") and that the case had been dismissed for lack of probable cause. Gawne retrieved the abstract of Murillo's arrest report (which contained the same information as the original report but without the arresting officer's signature) and the case report.

¶ 9 When asked what made Gawne believe that Murillo had engaged in criminal conduct, he responded, "There is possession of a controlled substance *** according to the arrest report, and I believe there's some additional information in the case report ***. [She] was a bartender and was aware of the trafficking that was going on and then refused to cooperate in the investigation." Gawne did not recall the nature of this "additional information." Gawne also did not recall trying to contact the officers who arrested Murillo or consulting with anyone. When asked why he denied Murillo clearance, Gawne responded "based on the fact that there was possession of a controlled substance and a refusal to cooperate with the police in the investigation."

¶ 10 Murillo's supervisor from Triad told her that the police had said that Murillo could no longer work at the police facility. The police would not give Murillo's supervisor any information as to why, and Murillo was terminated on February 10, 2009.

¶ 11 On August 25, 2010, Murillo filed suit against Triad and the City. She alleged that the City coerced or compelled Triad to segregate or terminate Murillo's employment based on the fact of her arrest. Murillo alleged that this violated the Act, which prevented employers from using the "fact of an arrest" as a basis to discriminate in employment.

¶ 12 In 2011, Triad settled with Murillo by giving her back her job; in exchange, Murillo agreed to dismiss her claims against Triad with prejudice. Murillo was again assigned to the first district police station.

¶ 13 Murillo moved for partial summary judgment, and the trial court granted Murillo's motion. The court found that the City had caused Triad to change the terms and conditions of her employment by removing her from the police station. Sergeant Gawne had only relied on the arrest report in preventing Murillo from getting a security badge to clean. The trial court transferred the case for jury trial to assess damages for the terms-and-conditions claim and to determine liability on whether the City coerced Triad to either segregate or terminate Murillo based on the fact of the arrest. Murillo prevailed at trial, and the jury awarded her damages for lost wages, pension benefits, and emotional distress in the sum of $87,227.75.

¶ 14 Following trial, Murillo's attorneys filed an extensively documented motion for attorney fees, asking for a total of $300,497.50. The trial court reviewed the memoranda of both plaintiff and the City and decided $320 to be a fair and reasonable hourly billing rate for Wilmes (the lead attorney) and reduced the rate of two senior attorneys, Karsh and Piers, to $320, saying that they were not entitled to any more than Wilmes and had no particular expertise warranting a higher rate. The remaining attorneys were granted a rate of $250 per hour, and the paralegals were granted a rate of $125 per hour.

¶ 15 The court also, and appropriately, reviewed the billing entries of all the work performed by Murillo's counsel and deleted or reduced time billed that "appeared to be excessive time for the task, duplicative, or unnecessary" but otherwise gave no specifics. The trial court granted additional fees of $15,661.17 for responding to the City's posttrial motion, applying the same hourly rate to each attorney and reducing hours "for matters that again appeared to be too much time for a task, duplicative, or unnecessary for some internal conferences or advising the status of the case to the client, delivery of courtesy copies, things of that nature, that would be overhead items." The trial court awarded $183,796.83, which included work on the fee petition.

¶ 16 The trial court awarded costs of $11,208.10 and prejudgment interest of 6% on the award of back pay and pension to Murillo. On September 26, 2014, the City filed a notice of appeal;

Murillo filed a cross-appeal on October 7, 2014.

¶ 17                                STANDARD OF REVIEW

¶ 18    We review a trial court's grant of summary judgment *de novo*. *Argonaut Midwest Insurance Co. v. Morales*, 2014 IL App (1st) 130745, ¶ 14. Summary judgment may be granted where there is no triable issue of material fact and the movant is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2010). Genuine issues of material fact exist where the material facts are disputed or, if undisputed, reasonable persons might draw different inferences from those facts. *Argonaut Midwest Insurance Co.*, 2014 IL App (1st) 130745, ¶ 14.

¶ 19    We review an award of attorney fees for an abuse of discretion. *Richardson v. Haddon*, 375 Ill. App. 3d 312, 314-15 (2007).

¶ 20                                     ANALYSIS
¶ 21                 The Trial Court's Grant of Partial Summary Judgment

¶ 22    The Act prohibits employers from "[using] the fact of an arrest" as a basis to discriminate in employment. 775 ILCS 5/2-103(A) (West 2014). The next section of the Act backtracks slightly by allowing employers to "[obtain] or [use] other information which indicates that a person actually engaged in the conduct for which he or she was arrested." 775 ILCS 5/2-103(B) (West 2014).

¶ 23    The City argues that Sergeant Gawne's use of the arrest reports was permissible under subsection (B) because those reports were "other information" and indicated that Murillo "actually engaged in the conduct" for which she was arrested. Therefore, according to the City, the trial court erred in granting partial summary judgment. Murillo counters that subsection (B) required Sergeant Gawne to investigate Murillo's arrest beyond the bare police reports to determine whether Murillo actually committed the crimes and, because Sergeant Gawne did not do so, the City's actions against her were based only on the fact of her arrest and violated subsection (A).

¶ 24    We strive to carry out legislative intent as embodied in a statute's plain language. *In re A.A.*, 2015 IL 118605, ¶ 21. We give undefined statutory words their natural and ordinary meaning. *People v. Williams*, 2015 IL App (1st) 133582, ¶ 13. The word "indicate" means "to serve as a sign, symptom, or token of; signify." American Heritage Dictionary 892 (4th ed. 2006). The main problem with Sergeant Gawne's use of the arrest reports was that these reports did not actually "indicate" or "serve as a sign" that Murillo possessed the drugs or committed any municipal offense (either illegal conduct on the premises or failure to cooperate with police investigating that conduct). The evidence shows that the City had to be relying on the "fact of the arrest" because there was nothing else on which it could rely. While the word "indicate" in subsection (B) does not mean "proof beyond a reasonable doubt"; it equally does not mean "unsupported assumption of guilt."

¶ 25    Murillo's arrest records (the original arrest report, the "case report," and the "criminal history report") provide no information she actually engaged in criminal conduct. Nothing in the arrest records shows she failed to cooperate with police, other than the fact that the criminal history report listed one of the charges as failing to cooperate with police. The City alleges that Murillo violated the municipal code, which prohibits a bar employee from "allow[ing] any illegal activity on the licensed premises" and requires such employees to report promptly any

- 4 -

illegal activity. Chicago Municipal Code § 4-60-141 (added May 17, 1995). But the arrest report does not tell us whether Murillo was "allowing" sales of drugs or not reporting it—the report does not describe Murillo doing, or failing to do, anything at all. As for the possession charge, the arrest report merely stated that Murillo was in physical proximity to some narcotics at her place of employment; there was no statement from her, no physical evidence, and no witness statements. On finding the drugs, the arresting officers apparently proceeded on the theory that Murillo must be guilty because she was tending the bar. That conjecture was so weak and unsupported that the criminal court judge dismissed the charges as lacking in probable cause.

¶ 26    Gawne's deposition testimony reveals that he concluded that Murillo actually had committed these offenses *because* she had been arrested for them. When asked why he denied Murillo a security clearance, he recited the charges against her: "there was possession of a controlled substance and a refusal to cooperate with the police in the investigation." The outcome of the criminal charges—outright dismissal for lack of probable cause—should have raised immediate doubts on Gawne's part. And this information appeared on the first page of her criminal history report. Gawne's use of the arrest report was not permissible under subsection (B) because it did not "indicate" Murillo actually committed the offenses, only the fact of her arrest.

¶ 27    This is not to say that an arrest report could never qualify as "other information," because an arrest report can include a wealth of detail on which an employer might rely. For example, the arrest report here could have included Murillo's confession to possessing the drugs, statements from witnesses that they had purchased drugs from Murillo, or a police officer's description of seeing Murillo holding or selling the drugs. This information could be sufficiently persuasive to "indicate" that the person actually engaged in the conduct for which he or she was arrested.

¶ 28    Nor does the statute prevent an employer from firing employees who were arrested even though their actions did not result in a legal penalty. A person could be arrested for criminal conduct without the State pursuing a criminal case against them, such as when a victim refuses to testify against a defendant or inculpatory evidence is suppressed. Certainly, an employer might gather sufficient "other information" indicating a person actually committed a crime even though they were never formally charged or convicted. See, *e.g.*, *Decatur Police Benevolent & Protective Ass'n Labor Committee v. City of Decatur*, 2012 IL App (4th) 110764, ¶ 35 (employer did not rely only on fact of arrest for domestic violence where arbitrator found by preponderance of evidence that event occurred); *Sroga v. Personnel Board*, 359 Ill. App. 3d 107, 114 (2005) (permissible for employer to disqualify employee based on employee's confession to law enforcement about employee's conduct).

¶ 29    Both parties have argued that the legislative history supports their position. But the plain language establishes the legislative intent—that the Act protects a person whose arrest is not an accurate signifier of their character or potential, who was arrested without probable cause or was simply in the wrong place at the wrong time. See *In re C.R.M.*, 372 Ill. App. 3d 730, 734 (2007) (legislature intended section 2-103(A) to "prevent an inquiry into mere charges or allegations of criminal behavior" (internal quotation marks omitted)). A well-meaning police officer can mistakenly arrest an innocent—but that innocent should not suffer the consequences of the mistake. Those consequences can be dire, as here for Murillo. See *Utah v. Strieff*, 579 U.S. ___, ___, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, J., dissenting) (once

arrested, "[e]ven if you are innocent, you will now join the 65 million Americans with an arrest record and experience the 'civil death' of discrimination by employers, landlords, and whoever else conducts a background check"). Because the evidence shows that Sergeant Gawne used the fact of Murillo's arrest to deny her a security clearance, causing Triad to change the terms of her employment, the trial court did not err in granting Murillo partial summary judgment.

¶ 30                                          Attorney Fees

¶ 31    Both parties challenge the trial court's award of attorney fees. The State argues that the assessed attorney fees are too high; Murillo contends that they are too low. Both parties urge us to remand to the trial court for further explanation of its decision. We agree in part; the trial court did not sufficiently explain its rationale as to the reductions in time. *Richardson v. Haddon*, 375 Ill. App. 3d 312, 314-15 (2007) (trial court should explain why it is reducing the amount from what was requested in a fee petition).

¶ 32    As to billing entries, the trial court deleted time it considered "excessive *** , duplicative, or unnecessary" but did not specify which entries it was deleting. Trial courts may not arbitrarily reduce time; reductions require "a clear and concise explanation." *Advocate Health & Hospitals Corp. v. Heber*, 355 Ill. App. 3d 1076, 1078-79 (2005). The trial court did not provide this, and the parties should not need to divine the trial court's reasoning. We remand for the trial court to reconsider its reductions and enumerate reasons for a general percentage reduction or specific adjustments and write-offs. *Wendy & William Spatz Charitable Foundation v. 2263 North Lincoln Corp.*, 2013 IL App (1st) 122076, ¶ 42.

¶ 33    Courts expect attorneys in fee-shifting cases to voluntarily exercise billing judgment, as attorneys are prohibited from charging unreasonable fees. Ill. R. Prof'l Conduct (2010) R. 1.5(a) (eff. Jan. 1, 2010); see *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) ("In the private sector, 'billing judgment' is an important component in fee setting." (Internal quotation marks omitted.)). Prudent billing judgment involves writing off or adjusting "excessive, redundant, or otherwise unnecessary" time. *Hensley*, 461 U.S. at 434. Attorneys should inform the court by affidavit that they exercised billing judgment as well as how and in what amounts. On remand, the trial court should take into account whether Murillo's attorneys exercised such judgment.

¶ 34    Further, the trial court granted Wilmes his requested billing rate (at the 2013 rate) but reduced that of others with a meager explanation. The trial court abused its discretion in reducing those rates in an arbitrary fashion. Along with the time sheets for work on Murillo's case showing the hours expended and type of work done, Murillo's attorneys submitted billing records showing rates charged to clients and individual affidavits explaining why their experience entitled them to their requested rates. Further, they submitted affidavits from local civil rights attorneys explaining the market rate for this kind of work. Precisely the type of evidence needed for a trial court to decide whether requested rates are reasonable. See *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 401 Ill. App. 3d 868, 880 (2010) (in addition to services performed and amount of time expended, trial court should also consider skill and standing of attorney and "the usual and customary charges for comparable services"). In arguing against granting those rates, the City did not submit evidence to the contrary.

¶ 35    In reducing Karsh's and Piers' rates, the trial court said only that they had not done anything entitling them to a higher rate and did not have any more expertise than Wilmes. This is contrary to the record evidence showing that both had been practicing law for a considerably

longer time than Wilmes and had much more experience litigating civil rights cases in Chicago. We expect attorneys to staff cases efficiently, but we also expect a more junior attorney to take advantage of the knowledge and skills of his or her superiors, even if their time costs more money. The rates should reflect these differences. See *Verbaere v. Life Investors Insurance Co. of America*, 226 Ill. App. 3d 289, 300 (1992) ("Certainly, a senior partner and a new associate would not be billed out at the same hourly rate."). As for the other six attorneys (who spent much smaller amounts of time on Murillo's case), the trial court did not explain why it was reducing their rates to $250 per hour. Again, absent evidence to the contrary, it was an abuse of discretion for the trial court to arbitrarily set lower rates for seemingly no reason.

¶ 36    Finally, we grant Murillo's request for a remand to the trial court for consideration of Murillo's attorney fees and costs incurred in defending this appeal. *Demitro v. General Motors Acceptance Corp.*, 388 Ill. App. 3d 15, 25 (2009). The court should also consider Murillo's fees for defending against the City's section 2-1401 petition (which is not contained in the record before us).

¶ 37    Because we affirm the trial court's judgment, we need not address Murillo's cross-appeal issue regarding jury instructions given at trial.

¶ 38    We affirm the trial court's grant of partial summary judgment to Murillo. We remand to the trial court (i) to reexamine the reductions of time spent by Murillo's attorneys in light of this opinion and give reasons for any reductions, (ii) to adjust the fee calculation based on the 2013 rates of each attorney, and (iii) to determine additional fees and costs for Murillo addressing the City's section 2-1401 petition and defending this appeal.

¶ 39    Affirmed in part, reversed in part, and remanded with directions.