2026 IL App (1st) 251083-U

FIRST DISTRICT,
SIXTH DIVISION
May 1, 2026

No. 1-25-1083

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* ESTATE OF MARGARET WHITE, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County, Illinois. |
| (Dho Cho, | ) | |
| | ) | |
| Cross-Petitioner-Appellant, | ) | No. 2024P004796 |
| | ) | |
| v. | ) | |
| | ) | |
| Eugene White Jr. and Eugene White Sr., | ) | Honorable |
| | ) | Aicha M. MacCarthy, |
| Cross-Petitioners-Appellees). | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice C.A. Walker and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1  *Held*:  We affirm the trial court's decision regarding the appointment of co-guardians for a disabled adult and reverse and remand the award of attorney fees and costs for further proceedings.

¶ 2  Margaret (Peg) White is in her mid 50's with Wolfram syndrome, a rare genetic disorder causing diabetes, blindness, hearing loss, and cognitive decline. Peg was largely self-sufficient but stopped working in October 2022 due to the advancement of her symptoms. As her condition

worsened, her longtime live-in boyfriend Dho Cho cared for her needs. In June 2024, Peg's brother and father, Eugene White Jr. and Eugene White Sr., assumed responsibility for Peg's care after discovering Cho had been abusing Peg. In July 2024, Cho petitioned for guardianship of Peg as a disabled individual under the Probate Act of 1975. 755 ILCS 5/11a *et seq.* (West 2024), and Eugene Jr. and Eugene Sr. filed a cross-petition.

¶ 3        After a five-day evidentiary hearing, the trial court appointed Eugene Jr. and Eugene Sr. co-guardians of Peg's person and estate. Cho appeals, arguing (1) the trial court's failure to make written factual findings under section 11a-12(d) of the Act (755 ILCS 5/11a-12(d) (West 2024)) requires reversal; (2) the trial court abused its discretion in appointing Eugene Jr. and Eugene Sr. as co-guardians; and (3) the trial court abused its discretion in awarding only 14% of the attorney fees and costs Cho requested. We affirm the order of co-guardianship and reverse and remand the issue of attorney fees and costs for further proceedings.

¶ 4                                    I. BACKGROUND

¶ 5        On July 9, 2024, Peg's longtime live-in boyfriend Cho filed a petition for appointment as plenary guardian of Peg's person. He later amended his petition to appoint Arboretum Wealth and Trust Management as guardian of Peg's estate. Two days later, the court appointed Amy Gjesdahl as Guardian ad Litem (GAL), and two weeks later, Eugene Jr. and Eugene Sr. filed a cross-petition for plenary guardianship of Peg's person and estate.

¶ 6                              A. Evidentiary Hearing

¶ 7        In December 2024, the trial court held a five-day evidentiary hearing on the petitions.

¶ 8                            1. Peg's Past and Current Care

¶ 9        The evidence shows Peg developed diabetes as a child and was diagnosed with Wolfram syndrome in college. Despite a significant decline in her vision and hearing, Peg earned an

undergraduate degree and a master's degree from Georgetown University. Afterwards, she worked for the City of Chicago and lived independently in her own home, which was two doors down from her father Eugene Sr. and two blocks away from her brother Eugene Jr. In 2009, Peg met Cho on a dating app. After dating two years, Cho moved in with Peg who was already partially hearing impaired and legally blind. Cho testified that his involvement in Peg's care increased gradually and that, sometime after 2017, he began managing her blood glucose and developed a detailed care plan with her input.

¶ 10       In October 2022, Peg stopped working due to frequent hospitalizations from urinary tract infections (UTIs). While under Cho's care, she was hospitalized for UTIs approximately 15 times in a two-year period. After a lengthy hospitalization in February 2023, a home-care agency was engaged to assist Peg. In March 2023, Eugene Jr. took Peg to Washington University in St. Louis for an evaluation by Dr. Fumihiko Urano, a leading Wolfram syndrome specialist. Dr. Urano confirmed the diagnosis with genetic testing and provided several referrals.

¶ 11       On April 4, 2023, Peg signed a Power of Attorney (POA) for property, naming Eugene Jr. as her agent. On May 1, 2023, she named Cho as her POA for healthcare. The May 2023 healthcare POA says Peg wants her "life prolonged to the greatest extent possible." According to Cho, Peg made him promise he would not let her die.

¶ 12       In March 2024, Peg was prescribed a straight catheter to help prevent UTIs. Peg's urologist showed Cho and her caregivers how to change the catheter. Cho would change it five or six times a day, but Peg still suffered frequent UTIs. On May 29, 2024, Peg was hospitalized again for another UTI. Eugene Jr. testified that around that time he received multiple calls from Peg's caregivers saying Cho was verbally, mentally, and physically abusing Peg. The hospital discharge note dated June 4, 2024, corroborates this, stating, "Concerns raised by private

caregiver regarding abuse towards patient by significant other. [Adult Protective Services] report filed, ***. Discharged home with family, *** patient NOT to be alone with POA/SO Dho Cho."

¶ 13    Upon her discharge from the hospital, Peg stayed with Eugene Jr. for a few days, but said she wanted to go home. With Peg's permission, Eugene Jr. changed the locks to keep Cho out. Peg has been in her family's care since then.

¶ 14    On June 11, 2024, Peg executed a new healthcare POA, naming Eugene Jr. as her agent and his wife Michelle White as successor. This POA states that Peg does not want her life prolonged or life-sustaining treatment. It was executed approximately two months after her doctor, Dr. William Brander, opined that she was totally incapable of making personal or financial decisions.

¶ 15    Cho stated that Peg called him on June 15, 2024, told him she loved him, and then the call suddenly ended. Peg's friend, Mary Sanford, testified that Peg preferred independence from her family and believed Cho should care for her. Since June 2024, Sanford's calls to Peg have gone directly to voicemail, with no further contact.

¶ 16    Eugene Sr. testified that he has been involved in Peg's care "on and off *** her whole life," though Peg was always fiercely independent. At 94 years old, he is less involved in Peg's care, but he visits her nearly every day, shops for her, and answers caregivers' questions about her insulin.

¶ 17    Eugene Jr. testified he has helped Peg for years, especially after her health declined. Although Peg valued her independence, Eugene Jr., his wife Michelle, their daughters, and Eugene Sr. all contributed to her care by handling shopping, appointments, and prescriptions. Peg's doctors maintain a flexible care plan due to her changing condition, with 24-hour caregivers managing her glucose and insulin, and family stepping in as needed. Since September

2024, Peg has received home hospice care, including additional resources and twice-weekly visits from a nurse and nursing assistant to manage her catheter.

¶ 18                                    2. Financial Testimony

¶ 19          Eugene Jr. testified that he began working at his father's air compressor company in 1989. He now owns both the business and several residential properties located in Illinois, Indiana, and Michigan. Eugene Jr. admitted that he has struggled with a gambling problem since 2000, an issue he described as "never really under control," yet he estimated his net worth at over $10 million. He also estimated Peg's net worth at just over $1 million, not counting her pension's value. Peg's 2010 will lists Eugene Jr. and their late sister as the sole beneficiaries. Although Eugene Jr. has held Peg's property power of attorney since April 2023, he stated that his only involvement with her finances has been writing checks.

¶ 20                                    3. GAL and Care Manager

¶ 21          After her appointment as GAL, Gjesdahl conducted an unannounced visit on July 12, 2024. Eugene Sr. expressed concern and declined to leave her alone with Peg. When asked whom she preferred to make decisions for her, Peg said her father, though Gjesdahl's did not give it "as much weight" because Eugene Sr. was present. During a subsequent visit on August 7, 2024, when only Peg and the caregiver were present, Peg described Cho as her boyfriend and asked to see him, but she "specifically stated a preference for her father *** to act as her medical decision maker and that she trusted [him] to make decisions for her."

¶ 22          Gjesdahl contacted the caregiver agency, which reported that Cho had been inappropriately catheterizing Peg up to eight times a day and physically and verbally abusing her. Gjesdahl received similar accounts from Michelle White and Peg's caregiver. Adult Protective Services opened an investigation, but it was closed when the agency was unable to

reach Peg.

¶ 23    Gjesdahl's next visit, on September 13, 2024, was prompted by Cho's temporary guardianship petition alleging Peg was "unresponsive." Peg's condition was unchanged from the prior two visits. A supervised visit between Peg and Cho was scheduled for September 23, 2024. The caregiver stepped out because she did not feel safe or comfortable around Cho. When told Cho was present, Peg "immediately became agitated and asked if she had to do the visit." She did not calm down after an hour, and the visit did not proceed. Gjesdahl saw Peg again on December 2, 2024, but Peg was resting. The caregiver reported Peg remained at baseline but had slept poorly the night before.

¶ 24    Based on her observations, Peg's stated preference "for her family," and her review of the cross-petitioners' care plans, Gjesdahl recommended appointing Eugene Jr. and Eugene Sr. as co-guardians for Peg. At the time of her testimony, Cho had not yet amended his petition to appoint Arboretum as guardian of Peg's estate. When asked about Eugene Jr.'s ability to serve in that role, Gjesdahl noted no competing petition had been filed, though appointing a corporate fiduciary would not be inappropriate.

¶ 25    Dana Baumann of Rehab Assist was appointed care manager in September 2024. She met with Cho on October 10, 2024, during which he described his long-term care of Peg and his monitoring of her blood sugar. Baumann then met with Peg, Eugene Jr., Eugene, Sr., Michelle White, and Peg's caregiver at Peg's home. Peg appeared comfortable, relaxed, and continued to follow up with her doctors.

¶ 26    During an October 18, 2024 visit, when only Michelle White and the caregiver were present, Peg was more alert, talkative, and recognized Baumann's voice. Michelle said it was a "good day," and she was happy to see Peg talking and asking questions. On November 18, 2024,

Peg was comfortable, talkative, and excited about celebrating her birthday with her cousin and a friend. Baumann believed Peg's care plan was appropriate; she had ongoing medical oversight, a caregiver and hospice agency, and people checking in.

¶ 27                          4. Medical Testimony

¶ 28          Dr. Urano, a Wolfram syndrome specialist, stated the median life expectancy is 30 years. Major causes of death include aspiration pneumonia, from swallowing difficulties, and general neurological decline. Preventing and treating infections, especially bladder infections and UTIs due to loss of bladder function, is crucial. Self-catheterization helps, but improper technique can lead to frequent UTIs. Diabetes management is also vital and requires adjusting insulin or taking glucose tablets based on continuous glucose monitor readings. High blood sugar can cause ketoacidosis, coma, and long-term kidney, eye, and neurological problems. From 2011 through May 2024, Peg's average blood glucose was "really good." Her more recent numbers were "acceptable," though not ideal.

¶ 29          Dr. Brander served as Peg's primary care physician from mid-2022 to April 2023. He considered Peg's blood glucose adequately managed under Cho, but reported higher levels in October 2024, with a two-week average of 268 mg/dL and occasional readings up to 388 mg/dL, indicating poorly controlled diabetes. On April 22, 2024, Dr. Brander reported that Peg is legally blind, hard of hearing, has memory issues, depression, brittle type 1 diabetes, and requires 24-hour assistance. He concluded Peg cannot make personal or financial decisions and that a full-time guardian would be in her best interests.

¶ 30          The court admitted the deposition testimony of Dr. Louis Philipson, an endocrinologist specializing in diabetes management and treatment. Peg became his patient on December 14, 2023, at which time insulin was administered based on carbohydrate counting by Cho. During

November and December 2023, Peg's blood glucose levels approached 70 on several occasions, prompting concerns that Cho was "stacking" insulin doses due to a management approach more aggressive than required. Dr. Philipson recommended administering larger doses of insulin prior to meals and then waiting up to four hours before additional dosing, in order to prevent stacking and subsequent hypoglycemia.

¶ 31 On October 8, 2024, Peg's average blood glucose measured 268, which was considered elevated. As a result, Dr. Philipson modified her care plan to lower these readings. Since then, Peg has demonstrated improvement, with average Dexcom readings of 187 from October to November 2024, 163 from November to December 2024, and 165 from December 2024 to January 2025.

¶ 32       B. Trial Court's Ruling and Post-Hearing Motions

¶ 33 On January 31, 2025, the trial court issued an oral ruling, appointing Eugene Jr. and Eugene Sr. as co-guardians of Peg's estate and person. Without making specific findings of fact, the court explained it had "taken into consideration the testimony of the witnesses, the testimony of Dr. Brander and Dr. Urano, the CCP-211, reports of the GAL, the evidence presented including the evidence depositions of Dr. Leeper and Dr. Philipson, and the arguments of the attorneys." Based on this evidence, the court found that Peg needed a plenary guardianship because she is wholly incapable of making personal and financial decisions, and it appointed Eugene Jr. and Eugene Sr. as co-guardians of Peg's person and estate.

¶ 34 On February 4, 2025, the court entered a written order appointing Eugene Jr. and Eugene Sr. as co-guardians, stating, the "factual basis" for the ruling is: "The testimony of the Doctors, the Court Appointed Case Manager, the Court Appointed Guardian Ad Litem, and the Nominated Guardians, in addition to documents, statements, plans, transcripts, pictures, and

medical reports which were admitted into evidence throughout the course of the guardianship hearing."

¶ 35    On March 4, 2025, Cho moved to reconsider, or, alternatively, for the court to clarify its factual findings under section 11a-12(d) of the Act (755 ILCS 5/11a-12(d) (West 2024)). Cho also filed a petition for attorney fees and costs, seeking a $91,434.81 reimbursement from Peg's estate. See 755 ILCS 5/27-2 (West 2024). Eugene Jr. and Eugene Sr. objected, arguing Cho did not benefit Peg's estate and, thus, was not entitled to the requested fees. On May 21, 2025, the trial court denied Cho's motion to reconsider or clarify, stating the "factual findings are part of the record." The court awarded Cho $13,715.22 in attorney fees, explaining only that "Dho Cho was the original petitioner, and $13,715.22 will be approved."

¶ 36                                II. ANALYSIS

¶ 37              A. Written Findings Under Section 11a-12(d) of the Act

¶ 38    Cho argues the guardianship order should be reversed outright because the court did not put the factual basis for its findings in writing as required by section 11a-12(d) of the Act, which states:

> (d) The selection of the guardian shall be in the discretion of the court, which shall give due consideration to the preference of the person with a disability as to a guardian, as well as the qualifications of the proposed guardian, in making its appointment. However, the paramount concern in the selection of the guardian is the best interests and well-being of the person with a disability.
>
> One person or agency may be appointed a limited or plenary guardian of the person and another person or corporate trustee appointed as a limited or plenary guardian of the estate. If different persons are appointed, the court shall consider the factors set forth in subsection (b-5) of Section 11a-5. *The court shall enter a written order stating the factual basis for its findings.*

(Emphasis added.) 755 ILCS 5/11a-12(d) (West 2024).

¶ 39    Although we agree with Cho that the court's written order does not sufficiently state a

factual basis for its findings, reversal is not warranted. The record, along with the opinions provided by the doctors and GAL, amply supports the court's determination. As a court of review, we may affirm on any basis supported by the record if the judgment is correct. *In re Estate of McDonald*, 2014 IL App (2d) 230195, ¶ 45. Furthermore, as noted by the trial court, the "factual findings are part of the record."

¶ 40 Cho places considerable emphasis on whether the statutory language is mandatory or directory, but we need not resolve that question here. The record contains a robust factual basis to appoint a guardian for Peg, and no one disputes that a guardianship is warranted. They dispute only who should serve.

¶ 41 Nevertheless, we note that statutory language imposing a procedural command is presumed directory rather than mandatory, meaning that noncompliance does not invalidate the governmental action to which the procedure relates. *People v. Cooper*, 2025 IL 130946, ¶ 33. This presumption can be overcome if "the statute contains language prohibiting further action, or indicating a specific consequence, in the case of noncompliance," or "when the right or rights the statute was designed to protect would generally be injured by a directory reading." *In re Rita P.*, 2014 IL 115798, ¶ 44. Neither circumstance is present here.

¶ 42 First, section 11a-12 does not prohibit further action for failing to reduce factual findings to writing nor does it indicate any consequences for noncompliance. See 755 ILCS 5/11a-12. Second, we disagree with Cho that treating the language as directory reading would infringe on an appellant's rights by insulating trial courts from meaningful appellate review under the abuse-of-discretion standard. On this point, *Rita P.*, 2014 IL 1157958, is instructive.

¶ 43 In *Rita P.*, the supreme court determined that the Mental Health Code's requirement for final orders to include "a statement on the record of the court's findings of fact and conclusions

of law" was directory, not a mandatory rule. *Id.* ¶ 68; 405 ILCS 5/3-816(a) (West 2010). The court dismissed concerns that interpreting this provision as directory would compromise appeal rights, noting that appellate courts evaluate the correctness of the trial court's ruling, not the correctness of its reasoning. *Id.* ¶¶ 50-51. The court also distinguished *In re Madison H.*, 215 Ill. 2d 364 (2005) – the main case Cho relies on here – because it did not address the mandatory-directory distinction. *Id.* ¶ 65. The court further observed that written findings under the Juvenile Court Act, unlike the Mental Health Act, were necessary " 'to provide the parties, social services, and the court with clear benchmarks for measuring future progress toward the goal of reunification.' " *Id.* ¶ 64 (quoting *Madison H.*, 215 Ill. 2d at 380 (Kilbride, J., specially concurring)).

¶ 44 Similarly, the instant case does not involve the Juvenile Court Act or any ongoing proceedings in which the trial court's findings would serve as benchmarks for co-guardians or the ward. The only issue before the court is the determination of Peg's guardian, rather than the need for guardianship itself. Accordingly, the trial court's decision to appoint Eugene Sr. and Eugene Jr. as co-guardians can be assessed on the merits of the record, which provides substantial evidence and testimony supporting the conclusion that the court did not abuse its discretion in selecting Peg's family over Cho.

¶ 45 That said, we note that more detailed factual findings and explicit credibility determinations by the trial court would have assisted both the parties and this court in understanding the basis for its ruling. We recognize the considerable demands placed on trial judges and acknowledge that issuing thorough written orders in every case is difficult. Nonetheless, the statute contemplates such findings, and the interests of justice are better served when courts clearly articulate the reasons underlying their decisions.

¶ 46                                B. Guardianship

¶ 47          Cho contends the trial court abused its discretion by appointing Eugene Jr. and Eugene

Sr. as co-guardians and asks that he be appointed instead. The selection of a guardian for a

person with a disability is at the court's discretion, which must consider both the individual's

preference and the proposed guardian's qualifications. 755 ILCS 5/11a-12(d) (West 2024). The

primary concern is the disabled person's best interests. *Id.* The appointment will not be

overturned unless there is an abuse of discretion. *In re Estate of Johnson,* 303 Ill. App. 3d 696,

705 (1999).

¶ 48          Cho argues that Peg's preference for Eugene Sr. and her family should be given minimal

consideration since it was expressed after Dr. Brander's report in April 2024, which deemed Peg

incompetent. Cho claims that naming him as Peg's healthcare POA in May 2023 was her last

valid expression of intent and should be respected. However, the Act does not restrict the court to

only considering a disabled individual's final competent preference. See 755 ILCS 5/11a-12(d).

¶ 49          We also reject Cho's claim that Peg's preference for her father is "incompetent." Dr.

Brander's April 2024 evaluation, along with the observations of the GAL Gjesdahl and Peg's

care manager Baumann, show that Peg remained able to understand and answer basic questions.

Peg twice told Gjesdahl that she wanted her father to make decisions for her. Although Peg

referred to Cho as her boyfriend and expressed interest in seeing him, she never indicated to

Gjesdahl that she wanted him to serve as her decision-maker. By September 2024, Peg became

visibly distressed at the possibility of seeing Cho. Whatever the underlying cause, the record

shows that Peg's trust in Cho has diminished since May 2023. On this record, Peg's preference

for her father and family cannot be disregarded or denied appropriate weight.

¶ 50          In selecting a guardian, the court may consider: (1) recommendations of kinship or

family; (2) the relationship between the disabled person and the proposed guardian; (3) conduct by the disabled person "prior to being adjudicated disabled which manifests trust or confidence in the proposed guardian"; (4) prior actions by the proposed guardian indicating concern for their well-being; (5) the ability of the proposed guardian to manage the estate; and (6) the extent to which the proposed guardian is committed to discharging responsibilities that might conflict with his or her duties as guardian. *Johnson*, 303 Ill. App. 3d at 705. Considering these factors, we cannot say the trial court abused its discretion in selecting Eugene Jr. and Eugene Sr. over Cho.

¶ 51    Although their involvement in Peg's day-to-day care increased only in recent years, Eugene Sr. and Eugene Jr. remained active figures in her life. Peg chose to buy a home near her father and brother, named her brother in her will, and granted him property POA in April 2023. Eugene Sr. and Eugene Jr. also assumed responsibility for taking Peg to specialist appointments, securing caregivers and hospice care, and working to ensure her safety from Cho. Despite Cho's suggestion that Eugene Jr. cannot be trusted with Peg's estate, Peg obviously trusted him to make financial decisions for her throughout. There is nothing in the record to cast doubt on his motives and freedom from self-interest.

¶ 52    On the other hand, Cho and Peg's previously long-term, trusting relationship has deteriorated and has been nonexistent for nearly two years. Multiple abuse reports were made, and by September 2024 Peg refused to see him, as did her caregiver. We acknowledge that Cho cared for Peg for many years as her condition worsened, but we cannot overlook the significant change in Peg's behavior toward him after the abuse allegations, nor the repeated hospitalizations for UTIs while she was in his care.

¶ 53    Although Peg's blood glucose levels seemed to be better under Cho's care, there is much more to Peg's well-being than her blood sugar. Nonetheless, by January 2025, her numbers had

improved, and the record shows Peg is comfortable and well cared for by her family, who have made her care a "team effort" alongside her 24-hour in-home caregivers, her physicians, and the registered nurse and certified nursing assistant who visit twice weekly. Considering all the evidence and relevant factors, the trial court's decision to appoint Eugene Jr. and Eugene Sr. as co-guardians of Peg's estate and person was not an abuse of discretion.

¶ 54                                C. Attorney Fees

¶ 55        Although Cho's petition for guardship was denied, that ruling did not preclude him from seeking reasonable attorney fees for his counsel under the Act. Section 27-2 of the Act provides, "[t]he attorney for a representative is entitled to reasonable compensation for his services." 755 ILCS 5/27-2 (West 2024). A "representative" includes a person bringing a guardianship petition, in this case Cho. Even if unsuccessful, a representative's attorney is entitled to reasonable compensation so long as the fees benefited the estate in some way. See *In re Estate of Byrd*, 227 Ill. App. 3d 632, 640 (1992); *In re Estate of Roselli*, 70 Ill. App. 3d 116, 123 (1979). And while the trial court has discretion in assessing the reasonableness of fees, it may not reduce them arbitrarily. " '[R]eductions require 'a clear and concise explanation.' " *Murillo v. City of Chicago*, 2016 IL App (1st) 143002, ¶ 32 (quoting *Advocate Health & Hospitals Corp. v. Heber*, 355 Ill. App. 3d 1076, 1078-79 (2005)).

¶ 56        Cho argues he is entitled to the full $91,434.81 in fees and costs he requested, rather than the $13,715.22 the trial court awarded, because the trial court provided no explanation for the reduced award. While we express no opinion as to the appropriate amount Cho is entitled to, we agree that the court's award is arbitrary and cannot stand.

¶ 57        In granting only a fraction of Cho's request, the trial court stated in full: "Dho Cho was the original petitioner, and $13,715.22 will be approved." By awarding any fees at all, the court

necessarily found Cho was a representative and that his efforts benefited Peg's estate in some way. Yet the court offered no rationale for reducing the request by more than $75,000. We have reviewed the detailed billing statements. Nothing on their face appears patently unnecessary, and the hourly rates fall within a reasonable range. The costs, too, reflect ordinary litigation expenses that should be reimbursed.

¶ 58    Given the absence of any articulated basis for the reduction, and the apparent reasonableness of the hourly rates and tasks performed, we remand for the trial court to reconsider the amount of its award and to explain any reductions it deems appropriate. See *Murillo*, 2016 IL App (1st) 143002, ¶ 32 (remanding for trial court to reconsider its reductions and enumerate the reasoning for those reductions in attorney fee award); *Matter of Estate of Shull,* 295 Ill. App. 3d 687, 694 (1998) (appellate court reversed and remanded where the trial court did not explain the basis for its reduction in fees and awarded nothing in costs).

¶ 59    Finally, we note that although Eugene Jr. and Eugene Sr. initially challenged the attorney fees ruling by filing a cross-appeal, they have since abandoned that challenge by asking us to affirm the award. We express no view on the precise amount of fees and costs the trial court should award on remand, except to clarify that the unchallenged amount of $13,715.22 shall serve as the minimum for the recalculated award.

¶ 60                                III. CONCLUSION

¶ 61    For the foregoing reasons, we affirm the judgment of the trial court as to the appointment of co-guardians for Peg's person and estate. We reverse and remand for the trial court to reconsider the amount of attorney fees and costs awarded to Cho and reexamine the reductions of time spent by his attorneys.

¶ 62    Affirmed in part, reversed and remanded in part. Cross-appeal dismissed.